# IN THE CIRCUIT CLERK COURT OF ST. LOUIS COUNTY, MISSOURI

COPELAND, JAMES

    PLAINTIFF

VS

HUSSMANN CORPORATION

    DEFENDANT

06CC-001562 H CV

CASE NUMBER

## SUMMONS

THE STATE OF MISSOURI TO:   DEFENDANT (2)

    INGERSOLL-RAND COMPANY
    THE CORPORATION COMPANY - REG
    120 S CENTRAL AVE
    CLAYTON, MO 63105

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE THE ABOVE-NAMED COURT AND TO FILE YOUR PLEADING TO THE PETITION, A COPY OF WHICH IS ATTACHED HERETO, AND TO SERVE A COPY OF YOUR PLEADING UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW: ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE. IF YOU FAIL TO DO SO, JUDGMENT OF DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITION.

    DATE ISSUED: APRIL 25, 2006

    ATTORNEY:
    GENE GRAHAM
    WHITE ALLINDER GRAHAM BUCKLEY
    SUITE C
    19049 E VALLEY VIEW PKWY
    INDEPENDENCE, MO 64055



**JOAN M. GILMER**, Circuit Clerk

By _____
   Deputy Clerk

**SPECIAL NEEDS:** If you have special needs addressed by the American With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at lease three business days in advance of the court proceeding.

CCCDT186 Rev. 01/00

## NOTICE TO SHERIFF - DOCUMENTS TO BE SERVED WITH PETITION

- [ ] Certificate of Dissolution of Marriage
- [ ] Financial Statements
- [ ] Notice
- [ ] Temporary Restraining Order
- [ ] Interrogatories
- [ ] Other (Specify) _____

- [ ] FC Filing Certificate
- [ ] Motion/Affidavit for PDL
- [ ] Order of Appointment of Next Friend
- [ ] Request for Production
- [ ] Limited Entry of Appearance
- [ ] Notice of Parent Education Class/ Mediation Services

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I have served the within summons:

(1) By delivering on the _____ day of _____ 200____ a copy of the summons, petition, and any documents checked above to the within-named defendant/respondent

_____

(2) By leaving on the _____ day of _____ 200____ for the within named

defendant/respondent _____

a copy of the summons, petition, and any documents checked above at the dwelling place or usual place of abode of said defendant/respondent with some person of his or her family over the age of 15 years;

(3) By _____

_____

_____

All done in _____ County, Missouri.

Sheriff's fees:
Summons _____
Non est _____
Mileage _____
Total _____

Sheriff of _____ County, Missouri

By _____
Deputy Sheriff

## CERTIFICATE OF MAILING

I certify that on the _____ day of _____, 200 ____, I mailed a copy of the summons, petition and any documents checked above to defendant/respondent by (registered) (certified) mail, requesting a return receipt signed by the addressee only, to the defendant/respondent at the address furnished by plaintiff(s)/petitioner(s).

**JOAN M. GILMER, Circuit Clerk**

Date: _____

By _____
Deputy Clerk

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI
TWENTY-FIRST JUDICIAL CIRCUIT

| | |
|---|---|
| JAMES COPELAND<br>8540 College Avenue<br>Jennings, MO 63136<br><br>        Plaintiff,<br><br>-vs-<br><br>HUSSMANN CORPORATION<br>12999 St. Charles Rock Road<br>Bridgeton MO 63044<br>**SERVE REGISTERED AGENT:**<br>    The Corporation Company<br>    120 South Central Avenue<br>    Clayton, MO 63105<br><br>**INGERSOLL-RAND COMPANY**<br>12999 St. Charles Rock Road<br>Bridgeton MO 63044<br>**SERVE REGISTERED AGENT:**<br>    The Corporation Company<br>    120 South Central Avenue<br>    Clayton, MO 63105<br><br>**TERRY HERRINGTON**<br>**SERVE AT:**<br>12999 St. Charles Rock Road<br>Bridgeton MO 63044<br><br>        Defendants. | Cause No. _____<br><br>Division No. _____<br><br>**17** |

## PETITION

COMES NOW Plaintiff, and for his Petition against Defendant, alleges and states as follows:

## PARTIES

1. Plaintiff is an African American male who resides at the above address.

2. Defendant Hussman Corporation ("Hussman") is a domestic corporation incorporated under the laws of Missouri and is in good standing in the state of Missouri. At all times relevant herein Hussman conducted business in the state of Missouri at the address set forth above. Defendant Hussman maintains The Corporation Company, 120 South Central Avenue, Clayton, Missouri as its registered agent in the state of Missouri.

3. Defendant Ingersoll-Rand Company ("Ingersoll-Rand") is a foreign corporation incorporated under the laws of New Jersey and is in good standing in the state of Missouri. At all times relevant herein Ingersoll-Rand conducted business in the state of Missouri at the address set forth above. Defendant Ingersoll-Rand maintains The Corporation Company, 120 South Central Avenue, Clayton, Missouri as its registered agent in the state of Missouri.

4. Defendant Terry Herrington is an individual that resides in the state of Missouri and can be served at the address set forth above. At all times relevant herein Mr. Herrington was an employee of Defendants Hussman and Ingersoll-Rand and served as a Human Resources Representative for Defendants.

## JURISDICTION AND VENUE

5. Plaintiff's Petition is filed pursuant to 42 U.S.C. § 1981 on behalf of Plaintiff and all those similarly situated.

6. This Court has subject matter over this cause of action because the cause of action occurred and accrued in St. Louis County, Missouri.

7. Venue is proper in this Court because the cause of action occurred and accrued in St. Louis County, Missouri and because Defendants conduct business in St.

Louis County, Missouri, at the address set forth above, and Defendants can be found in St. Louis County, Missouri.

## FACTS COMMON TO ALL COUNTS

8. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

9. Plaintiff is an African American male.

10. Plaintiff began his employment with Defendant Hussman on or around September 30, 1996.

11. Plaintiff was employed by Defendants as a Line Control Technician.

12. Plaintiff was terminated from employment with Defendants on October 21, 2003.

13. Throughout Plaintiff's term of employment with Defendants, Plaintiff was subjected to a pattern of harassment based on his race including, but not limited to, racial slurs, comments, racially offensive photographs, and racially offensive graffiti in the restroom.

14. As early as October 1996 Mr. Gary Myers, a white male, referred to Plaintiff as a "low life mother f___." When Plaintiff complained he was told that he would be terminated if he did not return to his work station. Similarly situated white employees were not subjected to such slurs. Furthermore, Myers remarks were prompted by his racial animus toward African Americans like Plaintiff.

15. In February 1998 Plaintiff applied for a promotion to the position of third shift supervisor. Plaintiff's supervisor at that time was Pat Landwehr, a white male. Plaintiff was not given the promotion for which he was qualified and eligible. The position was

3

given to an outside individual. Upon information and belief, the position was given to a less qualified individual who was white and who was not employed by Defendant at the time. Plaintiff believes his race, African American, was the reason for, or a motivating factor in, the denial of this promotion.

16. In June, 1998 Mr. Earl Ball, a forklift operator, was having a disagreement with an African American forklift driver, Johnny Jackson. Mr. Ball broadcast over a work radio that "I can fix him, if someone brings the truck I will bring the rope." This comment was made shortly after the incident in Texas where an African American male was dragged to death behind a truck. Plaintiff heard Mr. Ball's comments and believes they were racially inspired. Earl Ball is a white male.

17. In response to Mr. Ball's radio broadcast Plaintiff left his office and went to each employee with a radio, asking if they had heard Mr. Ball's comment. Numerous employees, both Caucasian and African American heard Mr. Ball's remarks.

18. Plaintiff complained about Mr. Ball's comment to his supervisor at the time, Mr. Pat Landwehr, a white male.

19. Mr. Landwehr advised Plaintiff that Mr. Ball would not be allowed to drive the forklift or to use the radios again, but in only 22 days Mr. Ball was again driving the forklift and using the radios.

20. In March 2000 Plaintiff applied for a promotion to second shift supervisor. Plaintiff's supervisor at that time was Jim Joyner, a white male. Plaintiff was not given the promotion for which he was qualified and eligible. The position was given to Rita Fisher, a white worker in another department. Plaintiff was more qualified than Fisher and was denied the promotion based on his race, African American.

4

21. In March 2001 Plaintiff again applied for a promotion to second shift supervisor. Plaintiff's supervisor at that time was Defendant Pinkowski, a white male. Plaintiff was not given the promotion for which he was qualified and eligible. The position was given to Raymond Sweeney, an African American male. Consistent with its history of demonstrated racial hostility toward African Americans, Defendants demoted Mr. Sweeney from that position in or around October 2003.

22. In May 2001, following the death of a coworker, Plaintiff volunteered to work third shift. He was asked to train Mr. Bill Gorry, a white male, who had been moved from a supervisor position to a line controller position. Gorry had a long history of demonstrated racial hostility toward African Americans

23. Thereafter Bill Gorry harassed Plaintiff on a daily basis by making racial slurs, comments, displaying racial photographs, among other things.

24. Upon meeting Plaintiff, Mr. Gorry immediately attempted to tell him a "black joke." Plaintiff advised Mr. Gorry that he did not tell or listen to racial or ethnic jokes and further advised Gorry that this was offensive to him as an African American.

25. The following Monday Mr. Gorry showed Plaintiff a photograph cut from a magazine of a woman in "black-face" who Mr. Gorry stated, disingenuously, was his grandmother. Plaintiff advised Mr. Gorry that he was offended by the photograph and to please refrain from displaying it in Plaintiff's work area. Gorry displayed the photograph in an area where management employees saw it. No member of management made Gorry remove the photo.

5

26. Mr. Gorry refused to take the photograph down. Upon closer inspection by Plaintiff, the picture was not an actual photograph but a magazine clipping. Plaintiff again requested the Mr. Gorry take the photograph down and he refused.

27. Approximately two weeks later Mr. Gorry commented to Plaintiff that "those niggers down there would like nothing more than to see me fired."

28. When Mr. Gorry saw that Plaintiff was shocked and offended by his comment he responded "Oh James you're not a nigger like those mother f____ down there. You're a different kind. If my family had owned niggers like you my family would be rich today."

29. Plaintiff immediately advised his supervisor / superintendent, Mr. Robert Pinkowski, of Mr. Gorry's conduct and further advised Mr. Pinkowski that he could not work in that hostile work environment. Plaintiff outlined one by one these individual incidents. Pinkowski appeared to immediately become angry with Plaintiff for reporting Gorry's hate-filled and vulgar racial remarks.

30. Mr. Pinkowski refused to go to Mr. Gorry's work area to see the photograph or to speak with Mr. Gorry about his conduct. Plaintiff knew that Pinkowski had already seen the photograph.

31. Approximately two weeks later Mr. Gorry apologized to Plaintiff and had taken the photograph down. Gorry's apology did not appear contrite; rather Gorry was visibly angry with Plaintiff for reporting these incidents.

32. Plaintiff was asked to meet with the head of Human Resources, Terry Herrington, following Plaintiff's complaints. Herrington is a white male.

33. Before Plaintiff went to that meeting Mr. Gorry threatened Plaintiff that he had known Terry Herrington for several years, that nothing would happen and that Plaintiff

6

should just drop it. Gorry continued to taunt Plaintiff and repeatedly forecasted that Herrington would protect Gorry.

34. Mr. Herrington asked Plaintiff what type of discipline Plaintiff recommended with regard to Mr. Gorry and Plaintiff recommended termination. Herrington made it clear to Plaintiff that he wanted Gorry's discipline to be perceived as an action that the Plaintiff was responsible for.

35. Upon returning from the meeting with Mr. Herrington, Mr. Gorry approached Plaintiff and said "I told you so." Gorry indicated that he knew what had transpired and what was said in Plaintiff's meeting with Herrington.

36. Thereafter Mr. Gorry continued to come into Plaintiff's office on a regular basis and make racial statements about African Americans and Hispanics. Gorry made it clear to Plaintiff that he was immune from remedial action.

37. Plaintiff again complained to Mr. Pinkowski about Mr. Gorry's conduct.

38. Mr. Herrington later told Plaintiff that he did not remember being advised of the complaints. Plaintiff considered Herrington's untruthful memory lapses as part of the pattern of racial abuse and retaliation.

39. Mr. Gorry was on medical leave for a period of time and upon returning he advised Plaintiff that they would again be sharing an office. He told Plaintiff that he had brought some fried chicken for lunch and offered to share it stating "I know you people like fried chicken."

40. Plaintiff again complained to Mr. Pinkowski. Plaintiff's complaints were made in front of Mr. Glenn Compton, head of sheet metal at that time. Mr. Compton promised Plaintiff that he would take care of it.

41. Mr Compton then approached Plaintiff and advised him that he was surprised at Plaintiff's behavior. When Plaintiff explained the harassment he had been forced to endure at the hands of Mr. Gorry, Mr. Gorry was let go. Plaintiff believed Mr. Gorry had been terminated.

42. Mr. Gorry's termination occurred on November 11, 2002. Prior to this termination Plaintiff had been subjected to months of racial abuse.

43. Mr. Gorry called Plaintiff after his termination and bragged that he had received a nice severance package from Defendants, despite Plaintiff's complaints. Plaintiff interpreted Defendant's awarding Gorry a severance package as more evidence of management's attitude of condoning acts of racial hatred.

44. Mr. Herrington, head of Human Resources, advised Plaintiff that Mr. Gorry was not terminated for his treatment of Plaintiff but that Mr. Gorry had requested to be included in the next work force reduction and was simply separated as part of the reduction.

45. In February 2003 Mr. Gary Myers came into Plaintiff's office and threatened him while Plaintiff's supervisor, Joe Pinkowski observed.

46. Human Resources never asked Plaintiff to provide any information. When Plaintiff inquired about the status of any investigation into the February 2003 matter and whether Mr. Myers was reprimanded or disciplined he was curtly advised that it was none of Plaintiff's business.

47. Throughout Plaintiff's employment with Defendants, Plaintiff made repeated complaints about the racially offensive graffiti in the restrooms.

8

48. Defendants took no action in response to Plaintiff's repeated complaints about the racially offensive graffiti in the restrooms.

49. The racially offensive graffiti depicted in the restrooms throughout Plaintiff's period of employment with Defendants included phrases like "AIDS niggers go back to Africa" and "kill niggers."

50. Plaintiff was terminated on October 21, 2003, in clear retaliation against Plaintiff for notifying management of the racially hostile atmosphere.

51. Throughout Plaintiff's employment Defendant discriminated against African Americans and failed to hire African Americans in proportion to their representation in the labor pool.

52. Plaintiff's position was not eliminated, but was immediately filled by a young Caucasian female, Jamie Rapien, who was junior to Plaintiff.

## COUNT I - § 1981
### DISCRIMINATION, HARASSMENT AND RETALIATION
### (Against Defendants Hussman and Ingersoll-Rand)

53. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

54. Plaintiff's complaints were ignored and unanswered by Defendants and Mr. Gorry was allowed to continue his harassment of Plaintiff.

55. Plaintiff's complaints to his supervisor, Defendant Robert Pinkowski, were not relayed to upper management or human resources.

56. Rather than conduct any investigation of Plaintiff's complaints pertaining to the actions of Mr. Myers, as had been conducted pertaining to other black employees who committed similar infractions, Defendants took no action.

9

57. Plaintiff has since learned that white employees with less seniority were retained to do Plaintiff's job and received promotions.

58. Throughout Plaintiff's term of employment with Defendants, Plaintiff and other African American employees were continuously subjected to discriminatory terms and conditions of employment by Defendants based on Plaintiff's race – African American.

59. Defendant has a history of engaging in a pattern and practice of discriminatory conduct against African Americans.

60. During the term of his employment with Defendants, Plaintiff was continuously subjected to discriminatory slurs and comments by his co-workers, managers, and supervisors, as referenced above. Plaintiff complained about these remarks to his supervisors, who failed to take any action to remedy the situation or to investigate the complaints.

61. Since Plaintiff began reporting his complaints of racial discrimination and Defendants' agents and employees have retaliated against Plaintiff and the use of discriminatory slurs and comments based on Plaintiff's race not only continued, but intensified.

62. Plaintiff reported the discrimination and retaliation to agents and employees of Defendants, including Defendant Pinkowski, and Defendants failed to take any action to remedy the discrimination, and retaliation.

63. During Plaintiff's employment with Defendants, Plaintiff has been denied job opportunities and pay raises that have been given to less qualified white employees.

64. The foregoing conduct of Defendants' employees, including Defendant Pinkowski, was in the course and scope of their employment with Defendants and said employees were agents acting in furtherance of the Defendants' business interests.

65. Defendants' actions as set forth above constitute intentional discrimination based on plaintiff's race and interference with Plaintiff's right to make and enforce contracts as protected by 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

66. Plaintiff's race was a motivating factor in Defendants' discriminatory conduct, harassment and retaliation.

67. As a direct and proximate result of Defendants' unlawful acts Plaintiff has suffered damages, including but not limited to, economic loss in the form of lost wages and lost benefits; mental distress in the form of embarrassment, humiliation, anxiety and depression; attorneys' fees incurred herein.

68. The discrimination described herein above against Plaintiff by Defendants was intentional, willful, wanton, malicious and/or outrageous because of Defendants' evil motive and/or reckless indifference to the rights of others, and, specifically, Plaintiff, thus entitling Plaintiff to exemplary damages.

WHEREFORE, Plaintiff prays that this Court find that the Defendant has engaged in unlawful discrimination and interference with plaintiff's rights pursuant to 42 U.S.C. §1981, and respectfully requests that the Court grant him judgment against Defendants in an amount that is fair and reasonable, for punitive damages, for his costs and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

WHITE, ALLINDER, GRAHAM, & BUCKLEY, L.L.C

BY: _____
Gene P. Graham, Jr.        MO 34950
Deborah J. Blakely         MO 47138
19049 East Valley View Parkway
Independence, Missouri 64055
(816) 373-9080 Fax: (816) 373-9319
ggraham@wagblaw.com
dblakely@wagblaw.com

ATTORNEYS FOR PLAINTIFF

## REQUEST FOR JURY TRIAL

COMES NOW plaintiff, by and through the undersigned and hereby requests a trial by jury on all issues in the above-referenced Petition.

WHITE, ALLINDER, GRAHAM, & BUCKLEY, L.L.C

BY: _____
Gene P. Graham, Jr.        MO 34950
Deborah J. Blakely         MO 47138
19049 East Valley View Parkway
Independence, Missouri 64055
(816) 373-9080 Fax: (816) 373-9319
ggraham@wagblaw.com
dblakely@wagblaw.com

ATTORNEYS FOR PLAINTIFF

12

# THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations In Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

(1) **Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the partes. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

(2) **Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

(3) **Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

(4) **Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

(5) **Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73