UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES COPELAND,             )
                                   )
       Plaintiff,           )
                                   )
      vs.                 )         Case No. 4:06-CV-839 (JCH)
                                   )
HUSSMANN CORPORATION, et al.,    )
                                   )
       Defendant.      )

## MEMORANDUM AND ORDER

The matter is before the Court on Defendants Hussmann Corporation ("Hussmann"),

Ingersoll-Rand Corporation and Terry Herrington's ("Herrington") Motion for Summary Judgment

(Doc. No. 41), filed August 16, 2007. The matter is fully briefed and ready for a decision.

## BACKGROUND

Plaintiff James Copeland ("Copeland"), a black male, began his employment with Hussmann

at its Bridgeton, Missouri facility in September 1996, and Hussmann terminated it on October 21,

2003. (Compl., Doc. No. 1 at ¶¶ 10-12). He began as an "hourly employee in manufacturing." (Defs.'

Statement of Uncontested Material Facts in Supp. of Defs.' Mot. for Sum. J. ("Defs.' Facts"), Doc.

No. 42 at ¶ 6). In 1997, Hussmann promoted him to line control technician, a job which involves

overseeing the manufacturing floor. (Id. at ¶ 14).[1]

---

[1]In his Statement of Facts, Plaintiff not only contests this job description but also moves for
the Court to strike ¶ 14 because it contains no citation to the record. (Plaintiff's Resp. to Def.'s Facts,
Doc. No. 49 at ¶ 14). In fact, Plaintiff's Statement of Facts contains numerous requests to strike
portions of the Defendants' Statement of Facts for violating E.D.Mo. L.R. 4.01(E) and for containing
"immaterial and prejudicial" facts. (see, e.g., id. at ¶¶ 10, 14). In turn, Defendants have filed a motion
asking the Court to strike Plaintiff's "Statement of Additional Facts." (Defs.' Mot. to Strike, Doc.
No. 51).

# I.    Racial Incidents Involving Plaintiff

In July 2001,[2] Plaintiff and Bill Gorry ("Gorry"), a white male, began working together as line control technicians. (Pl.'s Resp. to Defs.' Statement of Uncontested Material Facts and Pl.'s Statement of Additional Facts ("Pl.'s Facts"), Doc. No. 49 at Ex. 11 p. 13-14, Ex. 22).[3] In July 2001, Gorry brought a picture to work of a white woman, whom he claimed was his great-grandmother, dressed in black face. (Def.'s Facts at Gorry Dep. pp. 7-10; Pl.'s Facts at Ex. 1 p. 57). Plaintiff told Gorry that he had seen the picture before in a museum. (Defs.' Facts at Pl.'s Dep. III pp. 3-4). Plaintiff testified that Gorry displayed the picture for three or four days, that other workers saw it, and that it offended him. (Pl.'s Facts at Ex. 1 pp. 56-60). The picture also caused Plaintiff to go home "upset and crying." (Id. at Ex. 3 p.22). Gorry claims that he removed the picture after learning that it offended Plaintiff and apologized to him. (Defs.' Facts at Ex. K).

Between July and September 2001, Gorry made comments to Plaintiff about him and other black employees. Gorry told Plaintiff that "if my family had owned your family, we'd be rich. You

---

Upon consideration, the Court will not grant Plaintiff's requests because he has misinterpreted Local Rule 4.01(E), which merely requires that each numbered paragraph should "indicat[e] whether each fact is established by the record, and, if so, the appropriate citations." This language does not suggest that the failure to cite to the record is grounds for striking a fact. Rather, it instructs a party to cite to the record if the record contains evidence to support the fact.

Additionally, the Court will not strike any of the facts contained in Defendants' Statement of Facts because it does not believe that they are somehow so impertinent or prejudicial to warrant resorting to the disfavored practice of striking them from the record. See Stanbury Law Firm v. IRS, 221 F.3d 1059, 1063 (8th Cir. 2000) (noting that motions to strike are disfavored and rarely granted). The Court will not strike Plaintiff's "Additional Statement of Facts" for the same reason.

[2]Plaintiff alleges that racial incidents occurred in 1996 and 1998. In a previous order, the Court determined that it could not consider these incidents due to 42 U.S.C. § 1981's statute of limitations. Copeland v. Hussmann Corp., 462 F. Supp. 2d 1012, 1022 (E.D. Mo. 2006).

[3]The parties have both filed an extensive record and as such, the Court has modified its usual citation format. When citing the record, the Court refers to the exhibits as they are titled by the parties. The page number cited, however, refers to the page in the docket, not the actual page in the exhibit. For example, if the parties cite to Plaintiff's deposition as "Pl.'s Facts at Ex. 1 p. 76," the Court will cite to it as "Pl.'s Facts at Ex. 1 pp. 35-36."

know, can you imagine how much cotton." (Pl.'s Facts at Ex. 1 p. 67). Gorry asked Plaintiff to "look at those niggers down there." (Id. at p. 61). Gorry also told Plaintiff that "you're not that kind of nigger, James. I'm talking about those lazy guys down there. You know, you work hard and you've got a family and you don't sell drugs. You know ... you're a good nigger." (Id.). Gorry believed that these comments were complimentary in nature. (Defs.' Facts at Gorry Dep. p. 5). After learning that they offended Plaintiff, Gorry attempted to apologize, but his apologies were racially insensitive as well. (Pl.'s Fact at Ex. 1 p. 68).

These exchanges prompted Plaintiff to complain to his supervisors. (Defs.' Facts at Herrington Dep. p. 6). Terry Herrington ("Herrington"), a member of the human resources department, met with Plaintiff on September 7, 2001 to discuss these incidents. (Id. at Ex. K). Herrington's notes indicate that they discussed the picture, the slavery remarks, and the apologies. (Id.). Plaintiff believes that Herrington failed to write down many of the incidents he related to him. (Pl.'s Fact at Ex. 1 pp. 68-69).

Following this investigation, Gorry received a letter of reprimand from Andy Schlote, the Superintendent of Sheet Metal, stating:

> This letter of reprimand confirms our conversation on September 19, 2001 concerning your remarks and actions directed towards a fellow employee, James Copeland. Our investigation and your admission show this behavior was inappropriate, tasteless, and racial in nature, not to mention is [sic] was very troublesome to James.
>
> Bill, we want to express to you how serious an offense Hussmann considers this and to let you know that many options of how to resolve this was [sic] discussed. It has been decided that in order for you to retain you employment with Hussmann you must contact the EAP under a mandatory recommendation and follow their prescribed treatment process. In addition, you are being placed on notice that further incidents of this nature will result in your termination with Hussmann Corporation.

(Defs.' Fact at Ex. L). Gorry completed the required treatment in December 2001. (Id. at Ex. M). Following the reprimand, Plaintiff and Gorry began working on separate shifts and had little interaction. (Defs.' Fact at Herrington Dep. p. 18).

In October 2002, Gorry used the word "nigger" in front of Plaintiff because he was frustrated with another black employee, whom he believed was harassing him. (Pl.'s Facts at Ex. 11 p. 22-23). At this time, he told Plaintiff the slur was "not meant for you. You are not a nigger." (Id. at pp. 23-24). Herrington was not told about this exchange. (Defs.' Facts at ¶ 145).[4] Shortly after this incident, Gorry went on medical leave. (Id. at ¶ 52).

Prior to his return on November 11, 2002, Gorry contacted Herrington and asked if they could discuss him receiving an early retirement.[5] (Pl.'s Facts at Ex. 6 p. 29). Herrington told Gorry that he had to discuss this request with management and would get back to him. (Id.). Later that day, Gorry, who was eating fried chicken for lunch, told Plaintiff that "I will be happy to share with you, I know you people like chicken." (Pl.'s Fact at Ex. 6 p. 28). Plaintiff then went and complained to two supervisors, Glenn Compton ("Compton") and Robert Pinkowski ("Pinkowski"), about the comment. (Id. at Ex. 7 p. 28). Compton then informed Herrington, who called Gorry and had him leave the building. (Id. at Ex. 6 pp. 29-30). Two days later, Hussmann granted Gorry's request for an early retirement, which included a severance package. (Id. at Ex. 31). At this time, Compton, the facility's manager, told Plaintiff that he would not see Gorry again and that he would have fired Gorry sooner if he had known about his behavior. (Defs.' Fact at Pl.'s Dep. II p. 2).

---

[4] Gorry was placed on a performance improvement plan in May 2002 for "lack of respect and insensitivity in communicating with fellow employees." (Pl.'s Facts at Ex. 20). Gorry completed this plan in September 2002. (Id. at Ex. 19). The parties have not informed the Court what prompted this performance improvement plan.

[5] There is some disagreement about whether the early retirement discussions began before or after the fried chicken incident. (Pl.'s Facts at p. 56).

According to Plaintiff, Gorry later called him to brag about his severance package. (Pl.'s Facts at Ex. 1 pp. 51-52). This call prompted Plaintiff to write Herrington a letter on February 13, 2003 asking him why his "file" did not contain any record of his complaints about Gorry. (Defs.' Facts at Ex. P). He also expressed his concern that Gorry's termination "had nothing to do with my complaints" and that it "rewarded" Gorry for his "taunts and racial slurs." (Id.). Finally, Plaintiff wrote "[t]hese complaints of the ongoing hostile work environment should be in my file." (Id.). On February 18, 2003, Herrington responded that Plaintiff's complaints against Gorry were documented and that Hussmann took "appropriate action" following its investigation. (Id. at Ex. P). Furthermore, he wrote that Hussmann believed all of the "objectionable behavior stopped as a result of the actions taken by the company. If this is not the case please contact me immediately." (Id.). Plaintiff did not contact Herrington after this letter because he believed that Herrington did not adequately help him in the past. (Pl.'s Facts at Ex. 1 p. 48).[6]

Aside the incidents involving Gorry, Plaintiff complained about racist graffiti in the bathrooms. (Pl.'s Facts at Ex. 2 p. 19). Plaintiff stated that "the graffiti was numerous" and that two phrases stuck out to him, "niggers go home" and "AIDS niggers go back to Africa." (Id. at Ex. 1A p. 21). Plaintiff complained to Pinkowski, who at first directed another employee cover up the graffiti with spray paint. (Id.). Both parties agree that maintenance was contacted to paint over the graffiti, but they disagree about who contacted them. (Pl.'s Facts at ¶¶ 51-57). Additionally, it is unclear if the graffiti was removed while Plaintiff worked at Hussmann. (Id. at Ex. 1 p. 69). Plaintiff testified that he had complained about the graffiti for years. (Id. at Ex 1A p. 25).

## II.    Plaintiff's Work History and Termination

---

[6]Evidently, Plaintiff again complained to Herrington about Gorry in October 2003. During this conversation, Herrington told Plaintiff that he "wished this Gorry thing would just go away." (Pl.'s Facts at Ex. 1A p. 33).

As previously stated, Plaintiff began his employment in 1996 and received a promotion in 1997. Between 1997 and 2002, he consistently received positive annual performance reviews. (Pl.'s Facts at Ex. 25). In November 2001, however, he received a memorandum from Pinkowski stating that he needed to "improve [his] attendance at work" because "twelve absences over the year" was "unacceptable." (Id. at Ex. 29). Plaintiff testified that Gorry's presence caused these attendance problems because "I couldn't work every day like that, not every day." (Id. at Ex. 2 p. 11).

In April 2003, Plaintiff received his mid-year performance review and rated "meets some expectations," meaning he "was having some performance issues." (Id. at Ex. 4 p. 19, Ex. 26). Plainitff's review occurred earlier than usual as Keith Kneipkamp ("Kneipkamp"), the human resources manager, testified that mid-year reviews were usually completed in the "latter part of the summer months." (Id. at Ex. 4 p. 19). His review stated that "James has had attendance problems this year and was placed on a PIP ... for excessive number of days absent. He has also been late a number of times and often arrives to work 'at the buzzer.'"(Id. at Ex. 26). He was again placed on a performance improvement plan in May 2003 to correct his attendance problems and successfully completed it in September 2003. (Id. at Ex. 28). Plaintiff testified that he requested "lean" training, but Pinkowski told him "it just wasn't [his] turn yet." (Id. at Ex. 1A p. 31). He also testified that other employees received training twice even though he had not received any training. (Id.).[7]

In 2003, Defendants ordered a twenty-five percent reduction in force ("RIF") at the Bridgeton facility due to declining profits. (Defs.' Facts at Kneipkamp Dep. II p. 2). This reduction encompassed all departments. (Id. at ¶¶ 88-91). To conduct this RIF, Defendants sorted its employees by job group. (Id. at Kneipkamp Dep. II p. 6). Plaintiff's group, which included line technicians and their supervisors, had ten other employees in it. (Defs.' Fact at ¶ 92, Pl.'s Facts at ¶ 93). Either

---

[7]Plaintiff did not state when he made these requests for training.

Herrington or Compton grouped these employees together. (Pl.'s Facts at Ex. 5 p. 37; Id. at Ex. 8 p. 6). Compton testified that two factors were used to determine which employees would be terminated. (Id. at Ex. 8 p. 10). The first factor was length of service, and the second factor was job capabilities, meaning the types of jobs an employee had previously performed at Hussmann. (Id. at pp. 10-11). They determined an employee's job capabilities by looking at the titles of the jobs that the employee previously had held. (Id.). Compton testified that broad job capabilities were important because he believed that the line technician and supervisor positions would merge into one job after the RIF. (Id. at Ex. 8 p. 12). It is unclear, however, whether this combined position had been proposed in October 2003, and it was never implemented. (Id. at Ex. 5 p. 58-59).[8]

Additionally, Defendants prepared a numerical ranking of the group. (Id. at Ex. 8 p. 10). Compton, Pinkowski, and Pat Landwehr ("Landwehr") ranked the employees in Plaintiff's group. (Id. at Ex. 6 p. 67). While conducting the rankings, the evaluators sat in separate rooms and were not allowed to speak with each other. (Id. at pp. 67-68). Employees were evaluated on approximately eight factors including: job knowledge, decision making, work accuracy, communication skills, supervisory ability, flexibility, meeting deadlines, teamwork, and planning skills. (Id. at Ex. 8 p. 6). The evaluators did not receive any written material on the employees. Rather, they relied on what they "knew about that employee for as far back as we had contact with them." (Id. at Ex. 7 p. 34; Id. at Ex. 6 p. 54). Herrington, however, told them only to consider the employee's performance in 2003. (Id. at Ex. 9 p. 57). Pinkowski rated Plaintiff "towards the bottom, but not on the bottom." (Id. at Ex. 7 p. 37). Landwehr, who had not supervised Plaintiff since 1999, rated Plaintiff as lowest in the group because "he couldn't perform" and had attendance problems. (Id. at Ex. 9 p. 9, 57). Plaintiff

---

[8]Compton later tried to implement it despite Kneipkamp's rejection of the plan. (Id. at Ex. 5 p. 61).

was the only employee downgraded by Landwehr for attendance issues. (Id.). Overall, Plaintiff received the third lowest score. (Id. at Ex. 14). All the employees ranked above him were white and the two ranked below him were both black. (Id.). Only one white employee received a score similar to the scores the black employees received. (Id.).

Following the forced ranking, Compton and Kneipkamp determined which employees would be terminated. (Id. at Ex. 8 p. 3-4). These recommendations were then presented to Larry Parson, the Vice President of Human Resources, who made the final decision. (Defs.' Facts at ¶ 110). Compton testified that the forced rankings were not used, but Kneipkamp implies that he relied, at least in part, on the rankings. (Pl.'s Facts at Ex. 4 p. 35; Id. at Ex. 8 p. 14). It appears that two white employees, Jamie Rapien ("Rapien") and Kelly Robison ("Robison") were the only employees with less seniority in the group than Plaintiff. (Id. at Ex. 14). Compton, however, testified that Rapien and Robison were kept rather than Plaintiff because they had broader job capabilities. (Id. at Ex. 8 p. 12-13).

On October 21, 2003, Defendants terminated Plaintiff's employment as a line control technician, but offered him a job in the hourly employee pool. (Id. at Ex. 6 p. 50). Plaintiff discussed this option with Herrington, who told him that it was not in his best interests because he had so little seniority as a hourly employee. (Id. at Ex. 2 p. 6). He did not discuss this option with anyone else because he trusted Herrington's judgment on human resources matters. (Id.). Even if he accepted the offer, he would have been laid off until at least April 2004. (Id. at Ex. 13). Plaintiff declined this offer and refused to sign a severance agreement. (Id.; Defs.' Facts at Ex. S). Both Compton and Kneipkamp testified that Hussmann did not replace Plaintiff following his release. (Defs.' Facts at Kneipkamp Dep. I. p. 3; Id. at Compton Dep. p. 27).

Plaintiff filed this suit on April 25, 2006 in Circuit Court of St. Louis County, Missouri. (Compl., Doc. No. 1-2). The Complaint claims that Defendants violated 42 U.S.C. § 1981 by denying Plaintiff promotions due to his race, creating a hostile work environment, racially discriminating against him, and retaliating against him. On May 31, 2006,[9] Defendants removed the suit to this Court on the basis of federal question jurisdiction. (Notice of Removal, Doc. No. 1). On June 7, 2006, Defendants filed a motion to dismiss claiming that part of his claims were time-barred. (Doc. No. 8). On October 26, 2006, the Court dismissed Plaintiff's claims that he was passed over for promotion. Copeland, 462 F. Supp. 2d at 1021-22. Additionally, the Court held that Plaintiff could not rely on incidents involving Earl Bail and Gary Myers that occurred in 1996 and 1998. (Id.). On August 16, 2007, Defendants filed the summary judgment motion presently before the Court. (Doc. No. 41). In this motion, Defendants assert no hostile work environment existed and that his termination was not racially motivated. (Id.). Plaintiff responds that genuine issues of material fact remain.[10]

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477

---

[9]Defendants timely filed their notice of removal because Plaintiff did not serve process on them until May 1, 2006. See 28 U.S.C. § 1446(b).

[10]Defendants recently sent the Court a letter "intended to supplement the authorities" provided by it in its summary judgment motion. (Doc. No. 55). Plaintiff has filed a motion to strike this letter. (Doc. No. 61). Upon consideration, the Court will not grant the motion to strike.

U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I. Plaintiff's Hostile Work Environment Claim

#### A. The Court Cannot Consider Incidents Occurring before April 18, 2002.

Defendants first assert that most of Plaintiff's hostile work environment allegations are time-barred. Plaintiff contends that the Court can consider all of his allegations against Gorry because they are sufficiently related to each other.

The Supreme Court has held that the four year "catch-all" statute of limitations, 28 U.S.C. § 1658, applies to claims brought pursuant to Civil Rights Act of 1991, 42 U.S.C. § 1981. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004); Jackson v. Homechoice, Inc., 368 F.3d 997, 999 (8th Cir. 2004). Claims of discrete actions and claims of hostile work environment are treated differently when applying the statute of limitations. Nat'l R.R. Passenger Co. v. Morgan, 536 U.S.

101, 110-114 (2002). A discrete action "occurred on the day it happened and constitutes its own unlawful employment practice." Mems v. City of St. Paul, Dept. of Fire & Safety Servs., 327 F.3d 771, 785 (8th Cir. 2003). Claims of a hostile work environment cannot occur on a single day; instead they occur over a series of days or perhaps years. Morgan, 536 U.S. at 114. For purposes of a hostile work environment claim:

> It does not matter ... that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for determining liability.

Id. at 117. In short, individual acts that make up a hostile work environment claim are not separated from the whole for purposes of timely filing. Id. at 118.

An employee, however, may not recover for previous acts of harassment if the later act "has no relation" to the previous one or "for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile work environment claim." Rowe v. Hussmann Corp., 381 F.3d 775, 779-80 (8th Cir. 2004) (citing Morgan, 536 U.S. at 118) (internal quotations omitted). The Eighth Circuit has found that a seven month hiatus in harassment is not enough to cause a break in the hostile environment. Rowe, 381 F.3d at 780; see also Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 356 (8th Cir. 1997) ("not infrequent" racist comments over the course of two years creates hostile work environment). Conversely, a roughly two year time gap does dissipate the connection between incidents. Gipson v. KAS Snacktime Co., 171 F.3d 574, 580 (8th Cir. 1999); see also Kline v. City of Kansas City, Fire Dep't, 170 F.3d 660, 666 (8th Cir. 1999) (series of events ending in 1986 and individual incidents that occurred in 1989 and 1993 did not create a hostile work environment). Aside from length of time, the Court looks at whether the same harasser is involved, whether the acts are similar in nature and severity, whether the employer knew of the harassment, and if there was an intervening act. Rowe, 381 F.3d at 779-80.

The Court previously held that any act occurring before April 18, 2002 was time-barred unless it could be considered part of a hostile work environment claim. <u>Copeland</u>, 462 F. Supp. 2d at 1021-22. After reviewing the record, the Court finds that the incidents involving Gorry that occurred before April 18, 2002 are time-barred because they are not sufficiently related to incidents occurring within the limitations period. Although the incidents involved the same actor, they were not similar in nature and severity. The more severe incidents occurred in 2001 when Gorry displayed a photo of a woman in black face, called Plaintiff a "nigger" on multiple occasions, and told him that he would have made a good slave. (Pl.'s Facts at Ex. 1 pp. 57-67). Conversely, only two incidents occurred in 2002, and only one involved Plaintiff. (<u>Id.</u> at Ex. 11). Specifically, Gorry made a statement implying that all black people love fried chicken. (<u>Id.</u> at Ex. 6). Although it is an offensive statement, it substantially less offensive than telling a person he would have made a good slave or calling him a "nigger." The thirteen month interval between events further dissipates the connection between them. Furthermore, it appears that Gorry and Plaintiff had very little interaction between September 2001 and November 2002 due to their placement on different shifts. (Defs.' Facts at Herrington Dep. p. 18). Finally, Defendants' punishment of Gorry in September 2001 was an intervening event. (<u>Id.</u> at Ex. L). As such, the Court will not consider any of the incidents occurring before April 18, 2002 involving Gorry.

**B.    <u>Plaintiff's Hostile Work Environment Claim Fails.</u>**

Defendants assert that Plaintiff's hostile work environment claim fails because the alleged harassment was not sufficiently severe and pervasive. Additionally, they assert that the claim fails because they took reasonable remedial actions.

In order to prevail on a race-based hostile work environment claim, a plaintiff must show that 1) he is a member of a protected group; 2) he was subjected to unwelcome harassment; 3) there was

a causal nexus between the harassment and his membership in the protected group; and 4) the harassment affected a term, condition, or privilege of employment. Turner v. Gonzales, 421 F.3d 688, 695 (8th Cir. 2005).[11] Additionally, if the harassment comes from a non-supervisory employee, as it did here, a plaintiff must also show that "the employer knew or should have known about the harassment but failed to take proper action." Williams v. ConAgra Poultry Co., 378 F.3d 790, 974 (8th Cir. 2004) (citing Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 n. 5 (8th Cir. 2000)). Here, Defendants do not dispute that Plaintiff satisfies the first three elements.

To demonstrate that harassment altered the terms and conditions of one's employments, "the conduct must be severe and pervasive, both objectively and subjectively." Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006). When determining whether a work environment is hostile or abusive, the Court examines the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005).

To satisfy this "high threshold of actionable harm," a plaintiff must show that "his workplace was permeated with discriminatory intimidation, ridicule, and insult." Canady v. Wal-Mart Stores, Inc., 440 F.34d 1031, 1035 (8th Cir. 2006). The Eight Circuit instructs that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Al-Zubaidy, 406 F.3d at 1039 (internal quotations omitted). Similarly, the Supreme Court implores lower courts to apply these demanding harassment standards to "filter out complaints attacking the ordinary tribulations of the workplace,

---

[11]Title VII and § 1981 claims alleging a hostile work environment are analyzed under an identical standard. See Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1076 (8th Cir. 2005).

such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998). Finally, this question is a legal question for the Court, meaning "a showing of some minimal level of harassment is necessary before a case is submissible to a jury." <u>Jackson v. Flint Ink N. Am. Corp.</u>, 382 F.3d 869, 869 (8th Cir. 2004).

As previously stated, Gorry was disciplined in April 2002 for making insensitive remarks to co-workers. Neither party, however, has identified the nature of these remarks. (Pl.'s Facts at Ex. 20). As such, this incident is irrelevant because, to the Court's knowledge, it lacks a racial element. Plaintiff has shown that Gorry called another employee a "nigger" following a dispute between them in October 2002. (<u>Id.</u> at Ex. 11 pp. 23-24). Finally, he has shown that Gorry made a comment to him about black people liking friend chicken in November 2002. (<u>Id.</u> at Ex. 6 p. 28). During this time, graffiti in the bathroom also stated "AIDS niggers go home" and "niggers go home." (<u>Id.</u> at Ex. 1A p. 21).

Upon consideration, the Court finds that harassment was not sufficiently severe or pervasive to affect the terms and conditions of Plaintiff's employment. Only one incident involved Plaintiff. The use of the term "nigger," while repulsive and offensive, is not enough to create a hostile work environment. <u>See</u> <u>Singletary v. Mo. Dep't of Corrs.</u>, 423 F.3d 886, 893 (8th Cir. 2005) (noting that racial slurs alone do not create a hostile work environment). None of the harassment was physically threatening. <u>Jackson</u>, 382 F.3d at 870 (holding that physically threatening graffiti turned an unactionable claim into one "on the cusp of submissiblity."). Furthermore, the actions within the limitations period were not at all frequent. <u>See</u> <u>Elmahdi v. Marriott Hotel Servs., Inc.</u>, 339 F.3d 645, 653 (8th Cir. 2003) (holding that being called "black boy" and "boy" on a few occasions, as well as being told black men have big penises, is not enough to create submissible case); <u>accord</u> <u>Elnashar v. Speedway SuperAmerica, LLC</u>, 484 F.3d 1046, 1059 (8th Cir. 2007) (holding claim not actionable

when coworker asked Muslim plaintiff if he had a harem, rode a camel, and had more than one wife). As such, Plaintiff's hostile work environment claim fails.

Plaintiff's hostile work environment claim also fails because he cannot show that Defendants knew about the harassment, but failed to "to respond in a prompt and effective manner." Diaz v. Swift-Eckrich, Inc., 318 F.3d 796, 801 (8th Cir. 2003). In determining whether the employer failed to "take prompt and effective remedial action to end the harassment," the Court considers the amount of time "between notice of the harassment and any remedial action, the options available to the employer, such as training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment." Arraleh, 461 F.3d at 979.

Following the November 2002 incident, Defendants took prompt action by questioning Gorry and sending him home. (Pl.'s Facts at Ex. 6 p. 29). Moreover, Gorry's employment was terminated shortly thereafter by giving him an early retirement. (Id. at Ex.31). Plaintiff has not put forth any evidence that he told supervisors of the October 2002 incident. (Defs.' Facts at ¶ 145). Similarly, Plaintiff testified that he did not inform Defendants of the phone calls Gorry made to him following Gorry's retirement in November 2002. (Pl.'s Facts at ¶ 193). Because Defendants had no reason to know about these incidents, they were under no obligation to take action regarding it. Thus, it appears that Defendants, when appropriate, took prompt and effective action to prevent a hostile work environment.

Plaintiff contends that an issue of material fact exists about whether Gorry's early retirement was planned before the November 2002 incident. Plaintiff also complains that Defendants' action, granting Gorry an early retirement and giving him a severance package, should not be treated as an effective remedial action because it rewarded Gorry for his inappropriate behavior. Both arguments are without merit. First, whether Gorry discussed an early retirement with Herrington before the

November 2002 incident does not change the fact that Defendants effectively removed him from the workplace and ended the harassment. Moreover, whether Gorry received a severance package is irrelevant. The relevant inquiry is whether Defendants took prompt action to remedy the harassment. There is no requirement that a plaintiff must approve of a defendant's remedial actions. The Court is satisfied so long as the actions promptly and effectively end the harassment, which Gorry's early retirement accomplished. As such, Plaintiff's hostile work environment claim also fails for this reason.[12]

## II.   Plaintiff's Retaliation Claim

Plaintiff also alleges that Defendants terminated him in response to his complaints in February 2003 and October 2003 of a hostile work environment. In their summary judgment motion, Defendants assert that Plaintiff fails to make a prima facie retaliation case. They also assert that even if he does make a prima facie retaliation case, he has not presented enough evidence to overcome their showing of a legitimate, non-discriminatory reason for his firing.

Because Plaintiff has no direct evidence of retaliation, his claim is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Twymon v. Wells Fargo & Co., 462 F.3d 925, 936 (8th Cir. 2006). Under this framework, Plaintiff has the initial burden of establishing a prima facie case of retaliation. Clark v. Johanns, 460 F.3d 1064, 1067 (8th Cir. 2006). Once Plaintiff satisfies this burden, Defendants must offer a legitimate, non-discriminatory reason for the employment action. Quick v. Wal-Mart Stores, Inc., 441 F.3d 606, 610

---

[12]Inclusion of the 2001 incidents would not change this result. Specifically, Defendants took prompt action once Plaintiff informed them of the harassment. Notably, a letter of reprimand was written to Gorry and he was ordered to attend training. (Def.'s Facts at Ex. L). Furthermore, he and Plaintiff did not work on the same shift following this incident. (Id. at Herrington Dep. p. 18). Finally, Plaintiff does not complain of any harassment coming from Gorry after his disciplining until October 2002. Based on this evidence, no reasonable juror could conclude that Defendants failed to take prompt and effective action.

(8th Cir. 2006). The burden then returns to Plaintiff to show that the employer's reason was a pretext for discrimination. Id.

## A.     Plaintiff Does Establish A Prima Facie Retaliation Claim

To establish a prima facie case of retaliation, Plaintiff must present evidence that 1) he engaged in a protected activity; 2) an adverse employment action was taken against him; and 3) a causal connection exists between the two. Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 826 (8th Cir. 2006).[13] The threshold of proof to establish a prima facie case is "minimal." Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005)(citing Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1022 (8th Cir. 1998)). Here, Plaintiff engaged in protected activity in February and October 2003 because he complained to Herrington about Gorry's harassing behavior. Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (complaining about discriminatory behavior in the workplace is protected activity); Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006).

The Supreme Court has recently clarified the meaning of adverse employment action. Burlington N. & Sante Fe Ry. Co. v. White, --- U.S. ---, 126 S. Ct. 2405, 165 L. Ed 2d 345 (2006). The Supreme Court adopted the standard that a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415. (internal quotations and citations omitted). Here, three adverse employment actions occurred. First, Defendants placed Plaintiff on a performance improvement plan in May 2003. Second,

---

[13]The Court applies the same standards in retaliation claims under Title VII and § 1981. See Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002).

Defendants gave Plaintiff a bad performance review. Finally, Defendants terminated Plaintiff's employment in October 2003.

To prove causation, a plaintiff must show that an employer's retaliatory motive played a part in the adverse employment action. Hughes v. Stottlemyre, 454 F.3d 791, 797 (8th Cir. 2006). Evidence that gives rise to an inference of retaliatory motive is sufficient to prove a causal connection. Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002). Although evidence of a temporal connection alone can satisfy this causation element, Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001), "in general more than a temporal connection is required to present a genuine factual issue on retaliation." Wallace, 442 F.3d at 1119. Aside from a temporal connection, the Court looks at any other evidence that "lends support to an inference of causation." Id. at 1120. For example, the Court looks at whether the decision maker knew of plaintiff's claim. See Robinson v. Potter, 453 F.3d 990, 994 (8th Cir. 2006). It also looks at whether defendant inconsistently applied its policies to plaintiff. Wallace, 442 F.3d at 1120. Other factors, such as plaintiff's previous performance, and whether the employer was downsizing are relevant. See Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 503 (8th Cir. 2005) (examining plaintiff's previous, and overall, performance); Cheshewalla v. Rand &Son Const. Co., 415 F.3d 847, 852 (8th Cir. 2005) (holding employer's downsizing is relevant).

Upon consideration, the Court finds that Plaintiff has come forward with enough evidence to show a causal connection. Notably, Plaintiff received his mid-year review earlier than the other employees and was denied training. (Pl.'s Facts at Ex. 4 p. 19, Ex. 1A p. 31). Herrington knew of his complaints. (Defs.' Fact at Ex. P; Pl.'s Facts at Ex. 1A p. 33). Compton and Pinkowski were aware that Plaintiff had previously made complaints regarding racial discrimination and harassment. (Pl.'s Facts at Ex. 1A p. 23, Ex. 7 p. 16). He was placed on an improvement plan roughly two months after

- 18 -

his February 2003 complaints and was terminated in October 2003 only three weeks after complaining to Herrington. (Defs.' Facts at Ex. P; Pl.'s Facts at Ex. 1A p. 33, Ex. 8 p. 12, Ex. 28). Taken as a whole, this evidence satisfies the minimal threshold of proof required and raises an inference that his complaints may have played some part in his dismissal. As such, the Court finds that Plaintiff has made a prima facie retaliation case.

The burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for terminating Plaintiff. They assert that his termination was part of an overall reduction in force. Furthermore, they included Plaintiff in this reduction because he had less seniority than all but two of his co-workers and the less senior co-workers possessed jobs skills that he did not. (Pl.'s Facts at ¶¶ 268-69). As such, Defendants have put forth a legitimate, non-discriminatory reason for his termination.

Thus, the burden shifts back to Plaintiff to show that Defendants' reasons are a pretext for discrimination. To prove pretext, Plaintiff must both discredit the asserted reason for his termination and show "the circumstances permit drawing a reasonable inference that the real reason for his [termination] was retaliation." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007). Making a showing of pretext requires "more substantial evidence than it takes to make out a prima facie case, ... because unlike evidence establishing a prima facie case, evidence of pretext ... and retaliation is viewed in light of the employer's justification." Id. (citations omitted). To carry this burden, the employee must show that the proffered reason was "unworthy of credence." Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005)(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). An employee can demonstrate pretext by showing the employer meted out more lenient treatment to similarly situated employees who did not engage in the protected activity. Salitros v. Chrysler Corp., 306 F.3d 562, 570 (8th Cir. 2002). Another method is

to show that the employer's proffered reason has no basis in fact. <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 835 (8th Cir. 2002).

Upon consideration, the Court finds that genuine issues of material fact prevent it from determining whether Plaintiff can show pretext. Specifically, fact issues surround whether Defendants believed, at the time of the force reduction, that they actually needed workers with more diversified skills than Plaintiff possessed. (Pl.'s Facts at ¶ 290). Additionally, fact issues surround whether Defendants had a factual basis for concluding that the less senior employees actually had broader job capabilities because they only relied on previous job titles. (<u>Id.</u> at ¶¶ 268-72, Ex. 4). Additionally, an issue of fact exists about whether the force rankings, which ranked all of the black employees lower than the white employees, were actually used. In light of these factual disputes, and the evidence cited earlier to support Plaintiff's prima facie case, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim because the Court cannot say, as a matter of law, that Plaintiff fails to demonstrate pretext.

## III.    <u>Plaintiff's Racial Discrimination Claim</u>

Plaintiff also alleges that Defendants racially discriminated against him. Defendants assert that he cannot make out a prima facie case for racial discrimination. Because he lacks direct evidence of discrimination, Plaintiff's claim is again analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>see</u> <u>Gilmore v. AT & T</u>, 319 F.3d 1042, 1046 (8th Cir. 2003). In order to present a prima facie case of race discrimination, Plaintiff must show: "(1) that he is a member of a protected class, (2) that he was meeting the employer's legitimate job expectations, (3) that he suffered an adverse employment action, and (4) that similarly situated employees outside the protected class were treated differently." <u>Richardson v. Suggs</u>, 448 F.3d 1046, 1060 (8th Cir. 2006). Because Defendant has not challenged the first three elements, the Court

assumes that Plaintiff satisfies them. In their summary judgment motion, Defendants assert that Plaintiff does not satisfy the fourth element because he has not identified another co-worker who was "similarly-situated in all relevant respects." (Doc. No. 44 at p. 16).

A plaintiff can satisfy the fourth element of a racial discrimination claim in more than one way. First, he may show that a similarly situated employee, who is similarly situated "in all relevant respects" was treated differently. See Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). A plaintiff may also satisfy the fourth element by providing other evidence that his employer's reason was pretextual and that the termination occurred because of his race. Mitchell v. City of Dumas, 187 Fed. Appx. 666, 669 (8th Cir. 2006) (citing Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir., 1995).

Upon consideration, the same material issues of fact that prevented the Court from determining whether pretext existed in the retaliation context also prevents it from determining whether Plaintiff can make a prima facie case for racial discrimination. As such, Defendants summary judgment motion is denied as it relates to this claim.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Strike (Doc. No. 51) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Doc. No. 53) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Doc. No. 61) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Motion for Summary Judgment (Doc. No. 51) is **GRANTED** in part and **DENIED** in part.

Dated this 26th day of October, 2007.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE